USDC SDNY
DOCUMENT ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 7/26/2019

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DROR NISSIM,<br><br>       Petitioner,<br><br> -against-<br><br>ORNA KIRSH,<br><br>       Respondent. | 18-cv-11520 (ALC)<br><br>**OPINION & ORDER** |

**ANDREW L. CARTER, JR., United States District Judge:**

## SYLLABUS

Parents should jointly make decisions about childrearing. But, when marriages fail, family courts, or other appropriate courts, in the child's home country will decide difficult issues, including child custody and child support. Unfortunately, far too often, disgruntled adults abscond with their child to other nations, interfering with the custodial rights of the other parent and hindering the legal processes in the child's homeland.

In the 1980s, the Hague Convention was adopted to protect against the "unilateral removal or retention of children by those close to them, such as parents, guardians, or family members." *Gitter v. Gitter*, 396 F.3d 124, 129 (2d Cir. 2005) (internal citations omitted). The Convention aims to promptly restore the status quo by returning wrongfully removed children to the State of their habitual residence. *Id.* at 129-30.

In 2008, Orna Kirsh, a dual United States and Israeli citizen, married Dror Nissim, an Israeli citizen. In 2009, their Child, a dual United States and Israeli citizen, was born in Israel and, with the exception of the occasional vacation to the United States, has lived entirely in Israel.

In the Spring of 2018, Dror received a promotion that would require him to relocate from Israel to California. Dror and Orna jointly decided to move to California to pursue the promising economic opportunity. The parties agreed to travel separately to California so that Orna could prepare the living arrangements and get settled for the start of the Child's school. Orna and the Child did, in fact, travel to California on August 1, 2018, and Dror travelled to California on August 13, 2018.

On August 6, 2018, while Dror was in Israel, Orna purchased two plane tickets from California to New York for herself and the Child. Orna decided to depart for New York while Dror was in the air, on his way to California. Orna testified that, while in California, she had a "revelation" that she wanted to leave Dror and take the Child with her to New York. At no point, from the booking of the plane tickets to arriving in New York, did Orna disclose this "revelation," or any relevant facts, to Dror.

Upon landing in California, and after brief exchanges via text message and e-mail relating to pick-up at the airport, Dror arrived at the family's California apartment only to find it empty with a note on the kitchen counter. In the note, received by Dror on August 13, 2018, Orna disclosed her decision to relocate, with the Child, to New York.

The Parties' decision to move to the United States was conditioned on Dror, Orna, and the Child living in the same home as a family. Since Orna eliminated that condition by unilaterally carrying off the Child to another home on the other side of the country, there was no mutual agreement that the Child's habitual residence would change from Israel to the United States. As is discussed more fully below, Israel is the habitual residence of the Child; Orna retained the Child in breach of Dror's custody rights; and Dror was exercising those rights at the

2

time of the retention. None of the exceptions to the Hague Convention apply. The Child must be returned to Israel.

## PROCEDURAL HISTORY

Dror Nissim (hereinafter, "Petitioner" or "Dror") initiated this action on December 10, 2018. ECF No. 1. On December 12, 2018, this Court granted a Temporary Restraining Order restricting further removal of the Child from the jurisdiction of this Court. ECF No. 6. The Court required Orna Kirsh (hereinafter, "Respondent" or "Orna") to respond to the Petition. *Id.* The Parties appeared for a Conference on December 20, 2018, and the Court heard the Parties on visitation and travel restrictions. ECF No. 11. Further, the Court set a briefing schedule and scheduled a subsequent Conference. *Id.*

Respondent filed an Answer on January 3, 2019, and Petitioner filed a Response on January 17, 2019. ECF Nos. 12, 15. The Parties continued to provide the Court with supplemental briefing, and ultimately, the Court held an Evidentiary Hearing (the "Hearing") on March 1, 2019. ECF Nos. 17-35. Following the Hearing, the Parties submitted Proposed Findings of Facts and Conclusions of Law on March 27, 2019 and April 5, 2019, respectively. ECF Nos. 43-47.

After careful consideration, Petitioner's Petition for Return of a Child is hereby **GRANTED**.

## FINDINGS OF FACT

As stated, the Court heard the Parties on multiple occasions. The Parties were given the opportunity to present evidence both by way of written submissions as well as through the live testimony of Dror and Orna. Having reviewed the testimony and exhibits presented at the Hearing and the numerous filings, the Court makes the following factual findings:

3

Dror and Orna were married in 2008. Res. Post-Trial Brief p. 2, ECF No. 44 ("Resp. Brief"). In 2009, the Child was born in Israel. Resp. Brief p. 2; Pet. Post-Hearing Prop. Findings of Fact and Conc. Law ¶ 5, ECF No. 45 ("Pet. Brief"). Dror, Orna, and the Child are all citizens of Israel. Resp. Brief p. 2; Pet. Brief ¶¶ 5-6. Orna and the Child are also citizens of the United States. Resp. Brief p. 2; Pet. Brief ¶¶ 5, 7. The Child has spent her entire life in Israel with the exception of the occasional vacation to the United States. Pet. Brief ¶ 29; Pet. Return Minor Child ¶ 16, ECF No. 1 ("Petition"); Kirsh Decl. ¶ 6, ECF No. 29 ("Kirsh Decl.").

In the Spring of 2018, Dror received a promotion that would require him to relocate from Israel to California. Kirsh Decl. ¶ 16; Petition ¶ 17. After thorough consideration, Dror and Orna made the joint decision to move to California to pursue the promising economic opportunity. Kirsh Decl. ¶ 17; Petition ¶ 17. The decision to move was made as a family after extensive discussion and thought. Hr'g Tr. 9:13-15, ECF No. 41; Resp. Pet. Return Child ¶ 49, ECF No. 12 ("Response"). In preparation for the move, Orna quit her job, the family rented out their jointly-owned apartment on a one-year lease, and they shipped their personal belongings to California. Kirsh Decl. ¶ 17; Petition ¶ 19. Orna secured transitional housing, and both Parties signed a lease. Petition ¶ 19. The plan was for the Parties to travel to California one week apart so that Orna could "prepare the living arrangements and preparations for the start of the [Child's] school." Petition ¶ 22; Response ¶ 19. In accordance with that plan, Orna and the Child did, in fact, travel to California on August 1, 2018. Response ¶ 50. Further, Petitioner did, in fact, travel to California on August 13, 2019. Response ¶ 54; Petition ¶ 24.

On August 6, 2018, while Orna and the Child were in California and Dror was in Israel, Orna purchased two plane tickets to New York for herself and the Child. Hr'g Tr. 50:10-16. Orna and the Child were scheduled to depart for New York while Dror was in the air, on his way

4

to California. *Id.* While in California, she had a "revelation" that she wanted to leave her husband and take the Child with her to New York. *Id.* 53:6-11; Kirsh Decl. ¶ 21. At no point, from the booking of the plane tickets to arriving in New York, did Orna disclose this "revelation," or any relevant facts, to Dror. Hr'g Tr. 53:12-54:25. Upon "reflecting on [her] and the child's situation," she decided to move to New York with the Child. Kirsh Decl. ¶¶ 20-21. Respondent "felt that staying in New York would serve the child's best interests." Kirsh Decl. ¶ 23.

Upon landing in California, and after brief exchanges via text message and e-mail relating to pick-up at the airport, Dror arrived at the family's California apartment only to find it empty with a note on the table. Petition ¶ 25; Hr'g Tr. 55:1-57:20. In the note, received by Dror on August 13, 2018, Orna disclosed her final decision to relocate, with the Child, to New York. Response ¶ 22; Hr'g Tr. 57:9-19; Petition ¶ 25.

Since arriving in New York, Orna enrolled the Child in school and various extracurricular activities. Kirsh Decl. ¶ 23; Petition ¶ 26. With assistance from the Court, the Parties reached an agreement pertaining to visitation, and Dror continues to travel to New York for extended visits with the Child. *See* ECF No. 11; Kirsh Decl. ¶¶ 27-28. Dror and Orna remain married. *See* Petition; Response.

While the Parties dispute the family's intentions accompanying the move, it is this Court's finding that, upon relocating to California, it was the family's intention to move and live together. Kirsh Decl. ¶ 17; Petition ¶ 17. Further, this Court finds that the Parties intended on returning to Israel after their stay in California. Hr'g Tr. 15:4-13. Both Dror and Orna made preparations in accordance with that joint plan. Petitioner never sought any documentation other than a three (3) year work visa. Hr'g Tr. 43:11-14; Pet. Brief ¶ 40. Both Orna and Dror own

property, both jointly and separately, that they are currently renting or constructing in Israel. Hr'g Tr. 27:23-28, 46:20-47:12; Petition ¶ 21. Both Parties left credit card accounts open in Israel. Hr'g Tr. 33:4-8, 50:2-9. The family left items in storage that they were not bringing with them to California. H'rg Tr. 27:12-20. They only sought temporary housing. Kirsh Decl. ¶ 20. Furthermore, the Parties discussed their intent to remain in California on a temporary basis only. Pet. Brief. ¶ 49-51. Following Respondent's arrival to California with the Child, this Court finds that Orna's plan to move the Child to New York was concocted unilaterally without significant pre-meditation. Hr'g Tr. 53:6-11; Kirsch Decl. ¶¶ 20-21.

## DISCUSSION

### I. The Hague Convention

As previously mentioned, in the 1980s, there was a growing concern regarding international child abductions during domestic disputes. *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). The Hague Convention was adopted to protect against the "unilateral removal or retention of children by those close to them, such as parents, guardians, or family members." *Gitter*, 396 F.3d at 129 (internal citations omitted)."A Court considering a Hague Convention petition has jurisdiction only over the wrongful removal or retention claims," not the merits of any underlying custody dispute between parents or guardians. *In re Kim*, 404 F.Supp.2d 495, 511 (S.D.N.Y. 2005); *see Diorinou v. Mexitis*, 237 F.3d 133, 140 (2d Cir. 2001).

Article 3 of the Hague Convention states:

[t]he removal or the retention of the child is to be considered wrongful where –

a. it is in breach of the rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

6

b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Hofmann v. Sender*, 716 F.3d 282, 290-91 (2d Cir. 2013) (citing *Abbott*, 560 U.S. at 8). Thus, for a petitioner to prevail on a claim pursuant to the Hague Convention, he or she must demonstrate three things: (1) that the child was habitually resident in one State and has been removed to or retained in a different State; (2) that the removal or retention was in breach of the petitioner's custody rights under the laws of the State of habitual residence; and (3) that the petitioner was exercising those rights at the time of the removal or retention. *Id.* at 291 (quoting *Gitter*, 396 F.3d at 130-31). "A petitioner must establish each of these elements by the preponderance of the evidence." *Taveras v. Morales*, 22 F.Supp.3d 219, 230 (S.D.N.Y. 2014) (citing 42 U.S.C. § 11603(e)(1)(A)). Courts often evaluate these three elements via a two-pronged approach, inquiring first as to a child's habitual residence, followed by an analysis of whether "the removal or retention of the child was wrongful." *See Mota v. Castillo*, 692 F.3d 108, 112-13 (2d Cir. 2012) (citing *Gitter*, 396 F.3d at 130).

### a. The Habitual Residence of the Child is Israel

"[D]etermining a child's country of habitual residence is a threshold issue in nearly all Hague Convention cases." *Guzzo*, 719 F.3d 100, 108 (2d Cir. 2013). While the Hague Convention itself does not define "habitual residence," the Second Circuit has instructed that "courts should begin an analysis of a child's habitual residence by considering the relevant intentions," specifically "the intent of the person or persons entitled to fix the place of the child's residence." *Gitter*, 396 F.3d at 131. When those tasked with fixing a child's place of residence, for instance a child's parents, disagree on the child's place of habitual residence, the court must "determine the intentions of the parents as of the last time that their intentions were shared. *Id.* at

7

133. Without evidence of a "settled mutual intent" to change a child's habitual residence, courts have been reluctant to fund such a change. *Ermini v. Vittori*, 2013 WL 1703590, at *12 (S.D.N.Y. July 8, 2014). In addition to shared intent, courts must look to the acclimatization of the child to her new surroundings. *See Gitter*, 396 F.3d at 133 ("[W]e must consider whether ... the evidence points unequivocally to the conclusion that the child has become acclimatized to [her] new surroundings and that [her] habitual residence has consequently shifted."). While a child's acclimatization may reach a level of completeness such that removal from the new location would cause serious harm, such acclimatization is rarely on display. *See Heydt-Benjamin v. Heydt-Benjamin*, 404 F.App'x 527, 529 (2d Cir. 2010); *Ermini*, 2013 WL 1703590, at *12. Further, although the test is two-pronged, analyzing the intention of the persons entitled to fix a child's place of residence is the most important aspect of the analysis, particularly when a child is young. *See Guzzo*, 719 F.3d at 110 (2d Cir. 2013).

### i. There was No Settled Mutual Intent to Make the United States the Child's Habitual Residence

Throughout the life of these proceedings, including argument and the Hearing, the Parties presented very little evidence of any shared intent, let alone a settled mutual intent to change the Child's habitual residence. *See Ermini*, 2013 WL 1703590, at *12. Thus, the Court looks to the evidence presented as well as the conduct of the Parties over the last nine (9) years to determine their last shared intent as it relates to the habitual residence of the Child.

The Child was born in 2009 in Tel Aviv, Israel. Petition ¶ 28; Response ¶ 22. The Child has exclusively lived in Israel since her birth, along with her parents. *Id.* The Child took occasional vacations to the United States with Orna, but otherwise remained in Israel. Petition ¶ 29; Response ¶ 53. The Child attended school in Israel, had friends in Israel, and was already an accomplished gymnast at her young age. Petition ¶ 28; Response ¶ 22. Further, the Parties owned

8

multiple properties in Israel and were both physically and financially established there. Pet. Brief p. 18; Hr'g Tr. 27:23-28, 46:20-47:12. For all intents and purposes, the family's entire life was in Israel, especially that of the Child.

In October of 2018, the Parties decided to temporarily relocate, as a family, to California due to a lucrative job opportunity offered to Petitioner by his company. Petition ¶ 17; Kirsh Decl. ¶¶ 16-17. The evidence supports this Court's finding that the move was intended to be temporary. Dror obtained a temporary visa and demonstrated no intention of obtaining further documentation. Pet. Brief p. 17; Kirsh Decl. ¶ 17; Resp. Brief p. 8. Additionally, the Parties rented transitional housing, paid for by the Company, while maintaining their joint and individually owned property in Israel. Pet. Brief ¶ 37; Hr'g Tr. 27:23-28, 46:20-47:12; Petition ¶ 21. The Parties maintained multiple Israeli credit cards. Resp. Brief p. 10; Hr'g Tr. 33:4-8, 50:2-9. The Parties obtained storage for the items they were not bringing with them to California. Hr'g Tr. 27:12-20.

Correspondence with the Company indicated that the move was temporary.[1] Pet. Brief ¶¶ 35-36; Resp. Brief p. 9. Dror and Orna jointly e-mailed and discussed the transition and employment with representatives from the company and each other. Hr'g Tr. 7:15-8:14. Although the details and scope of the employment were fluid, the move was undoubtedly intended to be together – as a family. Hr'g Tr. 9:13-15; Kirsh Decl. ¶¶ 19-20. At no point in any discussions or communications did the family contemplate that Orna would pretend to move to California as a family, and unilaterally, without notice or consent, remove the Child to New York

---

[1] Respondent puts forth evidence in an effort to refute Petitioner's claim of the temporary nature of the relocation. However, evidence of an increased salary, evidence that Petitioner could have extended his stay in the United States, and evidence that the Parties "shipped 88 boxes in a containe[r] and sent 20 crates by air," without more, does not equate to an intention the change the habitual residence of the Child. *See* Resp. Brief pp. 9-10.

9

while Dror was flying from Israel, across the world, to meet his wife and Child.[2] *See* Petition; Response.

Thus, the Court finds that no settled mutual intent existed to change the Child's habitual residence from Israel to the United States.

### ii. The Minor Child Has Not Acclimated to the Change in Geography

Even though the Court determined that the last shared intent of the Parties was for the Child's habitual residence to be Israel, the Court must still determine if the Child has acclimated to her new surroundings. *See Heydt-Benjamin*, 404 F.App'x at 529.

At the time Petitioner initiated the instant proceedings, the Child's unfortunate reality had taken her from her home in Israel of nine (9) years, across the world to Mountain View, California, all just to turn around and trek back to the opposite coast of North America, landing in New York, New York. *See* Pet. Brief; Resp. Brief. All of this in a matter of twelve (12) days. *Id.* The Child was enrolled in three different schools in that same time frame, only two of which she actually attended. *Id.* As testified to and evidenced by documents produced, the Child had no friends, was unfamiliar with the new environment, and was struggling with the fact that her world had been turned upside down. Pet. Brief ¶ 52; Hr'g Tr. 65:4-15. Thus, at the time of filing, the Child had not acclimated to her new surroundings.

Even if the Court were to consider the time spent in the United States following the unilateral removal, this Court finds that little more has occurred to acclimate the Child to her new surroundings. While the Child has made some friends and joined extracurricular programs, the fact remains that she has spent less than a year in the United States. Response ¶ 53; *see*

---

[2] Respondent also cites to an agreement executed by the Parties in 2009, prior to the birth of the Child. *See* ECF No. 12, Ex 1. Respondent alleges that the 2009 Agreement demonstrates the last shared intent. Kirsh Decl. ¶ 21; Hr'g Tr. 58:8-12; Resp Brief pp. 11-12. As will be discussed, this Court finds that the 2009 Agreement is not indicative of the Parties' last shared intent as it relates to the habitual residence of the Child.

*Gitter*, 396 F.3d at 133 ("We would be hard pressed to conclude ... that a child who has spent fifteen years abroad in the same State is not habitually resident there ..."); *Mota*, 692 F.3d at 117 ("The evidence in this case in no way suggests that returning [the Child] to Mexico would subject her to serious harm."); *Lachman v. Lachman*, 2008 WL 5054198, at *6 (E.D.N.Y. Nov. 21, 2008) (Finding two years an insufficient amount of time to unequivocally point to the conclusion that the child was acclimated to the new location). Further, domestic instances involving the police indicate the difficult time the Child is having adjusting to not only her new home, but the geographical separation of her parents and the makeshift custody arrangements. Resp. Brief p. 17. Thus, this Court finds that the Child has not acclimated to the change in geography.

In sum, taking into consideration the evidence and conduct of the Parties, this Court finds that their last shared intent was for the Child's habitual residence to be Israel. Furthermore, the evidence does not demonstrate a transition so complete as to "unequivocally point to the conclusion that the child has acclimatized to the new location and has thus acquired a new habitual residence." *Ermini*, 2013 WL 1703590, at *12 (quoting *Gitter*, 396 F.3d at 134). Thus, Petitioner has satisfied his burden of establishing that the Child, who is a habitual resident of Israel, has been removed or retained in the United States.

### b. The Retention of the Child by Respondent is Wrongful

Having found Israel to be the Child's country of habitual residence, the Court also finds that the retention of the Child is wrongful. *See Mota*, 692 F.3d at 112-13. To be "wrongful," the retention of a child must be in breach of Petitioner's custody rights under the law of the state of habitual residence, and Petitioner must have been exercising those rights at the time of the removal or retention. *Id.* at 116-17. Here, the Parties do not dispute, and the Court finds, that

11

Petitioner has custody rights under Israeli law.[3] *See* Petition; Response; *see Mozes v. Mozes*, 239 F.3d 1067, 1084-85 (9th Cir. 2001); Legal Capacity and Guardianship Law 5728-1962 (stating that both parents are equal guardians of their children). Further, as the Child has spent her entire life with both of her parents, the Court finds that Petitioner was exercising those custody rights and would still be exercising those custody rights if the Child had not been wrongfully retained. Petition ¶ 16; Pet. Brief ¶ 29; Kirsch Decl. ¶ 6.

Two Second Circuit cases directly control the outcome of this case: *Mota* and *Hofmann*. *See Mota*, 692 F.3d at 116; *Hofmann*, 716 F.3d at 291. In *Mota*, the Second Circuit considered whether the retention of a child was "wrongful" when the mother consented to the child's removal to the United States from Mexico on the condition that she would later be able to join her child and the child's father at a later date. *See Mota*, 692 F.3d at 108. While the child successfully made the journey to the United States, the mother was unable to cross the border. *Id.* at 110. The child's father then refused to return the child to Mexico and the mother filed a petition pursuant to the Hague Convention. *Id.* at 111. On appeal, the Second Circuit agreed with the district court's ruling that the mother's consent to the child's removal was conditioned on the family living together in the United States. *Id.* at 118. Acknowledging the effect of the unmet condition precedent, the Second Circuit affirmed that the last shared intent of the mother and father was that the child live in Mexico, the state in which she was habitually resident. *Id.* at 116.

In *Hofmann*, a mother and father lived in Canada with their two sons. *Hofmann*, 716 F.3d at 286. Family difficulties led the couple to explore relocation opportunities to New York. *Id.* Shortly thereafter, the mother took the two sons on a trip to New York as the first step in their "permanent relocation" to New York. *Id.* Although the family was in the process of relocating,

---

[3] A determination of the scope and nature of Petitioner's custody rights is a decision exclusively within the jurisdiction of the Tel Aviv Family Court.

the district court found that any consent to the children's removal to New York, on the part of the father, was conditioned on the family living together in New York. *Id.* at 287. Although "this condition may not have been expressly stated, it was understood by the parties," the mother in particular. *Id.* Shortly thereafter, the mother decided that she was unhappy in the marriage, sought a divorce, changed her children's names, and found a home for her and the children. *Id.* at 288. The district court found that at no point did she share any of this with the father of the children. *Id.* Following their last vacation as a family, the mother told the father to meet her in New York under the guise of sending his children off for the first day of school. *Id.* at 288-89. When he arrived, however, he was served with divorce papers. *Id.* at 289. On appeal, the Second Circuit agreed with the district court in finding that the mother and father "had a shared intent to relocate to New York, but the extent to which that intent was shared was limited by [the father's] conditional agreement that the relocation was to be accomplished as a family." *Id.* at 293. Before the relocation was complete, the mother "developed the unilateral intention to reside in New York with the children but without" the father. *Id.* The mother's "decision to retain the children in New York without their father ... precluded satisfaction of the condition on which [the father's] shared intent was based." *Id.*

The facts here mirror those of both *Mota* and *Hofmann*. *See Mota*, 692 F.3d at 116; *Hofmann*, 716 F.3d at 291. As stated, Petitioner and Respondent exclusively raised the Child, together, in Israel, from her date of birth until the removal at issue in this case. Petition ¶ 16; Pet. Brief ¶ 29; Kirsch Decl. ¶ 6. The family made the decision to temporarily relocate to California, as a family, to pursue the lucrative economic opportunity presented to Petitioner. Petition ¶ 17; Kirsch Decl. ¶¶ 16-17. As in *Mota* and *Hofmann*, it was the family's intent to move and live in California together. *Id.*; *see Mota*, 692 F.3d at 118; *Hofmann*, 716 F.3d at 293. At the time Orna

13

and the Child arrived in California, Orna had yet to engage in the duplicitous conduct giving rise to the instant petition. Hr'g Tr. 53:12-54:25. During the week Orna and the Child were in California alone, Orna made the unilateral decision to move the Child to New York while Dror was on an airplane and completely unaware. Hr'g Tr. 53:6-11. When Petitioner arrived in California, Orna was gone, their Child was gone, and the only thing left was a note in the kitchen of their empty apartment. Petition ¶ 25.

As in *Mota* and *Hofmann*, Petitioner consented to the initial removal of the Child from Israel to the United States. Kirsch Decl. ¶ 16; Petition ¶ 17; *see Mota*, 692 F.3d at 108; *Hofmann*, 716 F.3d at 282. However, although perhaps not expressly stated, that removal was conditioned on the family living together, in California, for a short period of time. *See Hofmann*, 716 F.3d at 287. At no point was that conditioned satisfied. Thus, the Child continues to be wrongfully retained in New York in violation of Petitioner's custody rights.

## II. Petitioner Did Not Waive His Custody Rights or His Rights Pursuant to the Hague Convention

The Parties in this case enacted two agreements early in their relationship. In 2008, the Parties signed a financial agreement that was approved by court order. *See* ECF No. 15, Ex 2 ("2008 Agreement"). In 2009, the Parties entered into an agreement outlining the scope of the custody rights of the Parties in the event of a dispute. *See* ECF No. 12, Ex 1 ("2009 Agreement"). For the forthcoming reasons, neither agreement operates as a waiver of Petitioner's custody rights or his rights under the Hague Convention.

The 2008 Agreement is primarily financial in nature. *See* 2008 Agreement. The only mention of custody or parental rights is contained in a section stating that "it is hereby clarified and agreed between the parties that they intend to raise their joint children in Israel." *Id.* ¶ 9(b). There is no mention of the scope of the custody rights of either Party. The 2008 Agreement also

contains a clause indicating that the 2008 Agreement may only be modified or superseded "if approved by the Family Court with an explicit provision that repeals this Agreement or any part of it." *Id.* ¶ 13(c).

The 2009 Agreement was entered into prior to the birth of the Child. *See* 2009 Agreement. Two sections in the 2009 Agreement stand out. The third paragraph of the 2009 Agreement states:

> "If either of the parties decides that they are not interested in continuing their shared life, for any reason whatsoever, it is agreed between the parties that [Respondent] will be the parent with custody, and she may leave Israel and permanently reside abroad together with the daughter who is soon to be born and/or any other child who will be born to the parties in the future in any place that [Respondent] decides at her sole discretion."

2009 Agreement ¶ 3. Further, the fourth paragraph of the 2009 Agreement reads:

> "[Petitioner] undertakes not to object to and not to impede in any way the performance of clause 3 above, and he also commits not to undertake any proceedings, legal or otherwise, whether by himself or by someone on his behalf, whether in Israel or abroad, including proceedings under the Hague Convention, and including by means of a departure prohibition order, whether against [Respondent] or against the [Child] who is soon to be born to the parties and/or any other child who will be born to the parties."

2009 Agreement ¶ 4. While these clauses might be relevant and important in Family Court in Tel Aviv, the 2009 Agreement does not constitute a waiver of any sort in this proceeding. First, although it states that it supersedes the 2008 Agreement, the 2009 Agreement was not approved by court order. *See* 2009 Agreement ¶ 13. In addition, there is no indication that Dror still consented to the terms of the 2009 Agreement or that the 2009 Agreement was not modified, either orally or otherwise, at some point during the nine (9) years of marriage following its enactment. In fact, this Court finds that the conduct of the Parties indicates precisely that – a modification to the 2009 Agreement. From 2009 onward, the family lived together, in Israel. Petition ¶ 28. They did so for the entirety of the Child's life prior to her wrongful retention. *Id.*

15

She attended school, had friends, and was, by all accounts, doing very well. *Id.*; Response ¶ 22. The Parties provide no evidence indicating the thought of moving the Child or separating as a family. Moreover, the Parties provide no testimony pertaining to discussions or conversations relating to the 2009 Agreement following their initial reconciliation.[4]

Furthermore, the validity and relevance of the 2009 Agreement is belied by Petitioner's surreptitious conduct in this case. According to Respondent, she was acting within the terms of 2009 Agreement when she unilaterally moved to New York with the Child. Hr'g Tr. 58:8-12. Yet she still felt the need to move her family to California under the guise of a family relocation, enroll her Child in school, send misleading texts to her husband, and conceal from Dror that her actions were appropriate in accordance with the terms of their previously negotiated 2009 Agreement. The Court is not convinced. If Orna believed the 2009 Agreement to be binding, she would likely have told Dror at some point after she came to the realization that she wanted to leave. Booking plane tickets for the precise time Dror would be in the air, sending texts insinuating her and the Child's presence in California, and leaving a lone note in an otherwise empty apartment are actions inconsistent with the belief that her actions were protected by the 2009 Agreement. Response ¶ 22; Hr'g Tr. 50:10-16, 57:9-19.

For those reasons, neither the 2008 Agreement nor the 2009 Agreement constitute a waiver of Petitioner's rights in the instant case.

### III. The Exceptions to the Hague Convention Do Not Apply

"[T]he Convention demands the return of a wrongfully removed child to the child's habitual residence unless respondent establishes that an exception applies." *Tann v. Bennett*, 648 Fed.Appx. 146, 148 (2d Cir. 2016) (citing 22 U.S.C. § 9003(e)(2)).

---

[4] Aside from the evidence discussed above, the Parties provide no testimony or evidence regarding the Child or the family's living situation from 2009 up until late 2017.[4] Hr'g Tr. 81:5-83:1.

16

### a. Petitioner did Not Consent to the Removal of the Child

Article 13(a) of the Hague Convention creates an exception relevant to the instant case. A respondent may withstand a petition to return a child if:

> "[T]he person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; ..."

*See In re Kim*, 404 F.Supp.2d at 516. To successfully make out a consent defense, a respondent "must establish by a preponderance of the evidence that Petitioner had the subjective intent to permit Respondent to remove and retain the child for an indefinite or permanent time period." *Id.* More specifically, the key to the analysis is "the petitioner's subjective intent" – an inquiry that includes the nature and scope of the alleged consent. *Moreno v. Casilio Pena*, 2015 WL 4992005, at *11 (S.D.N.Y. Aug. 19, 2015) (quoting *In re Kim*, 404 F.Supp.2d at 516); *see Mota*, 692 F.3d at 117 (quoting *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005) ("[T]he nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account."). In other words, "it is important to consider what the petitioner actually contemplated and agreed to ...". *Chumachenko on Behalf of P.B. v. Belan*, 2018 WL 6437062 (S.D.N.Y. Dec. 7, 2018).

Here, the only evidence indicating consent is the 2009 Agreement previously discussed. *See* Resp. Brief pp. 11-13. As stated, Orna presented no evidence that any consent allegedly bestowed by the 2009 Agreement is still valid in the instant situation. Respondent provides no indication that the Parties discussed the 2009 Agreement at any point following the birth of the Child. Hr'g Tr. 81:5-83:1. Further, even if Dror did consent to the removal of the Child, he did not consent to removal in such a nefarious manner. Hr'g Tr. 53:3-56:4. Orna points to no conduct, conversations, or expressions over the past nine (9) years that would indicate consent to

17

the events that transpired. All of the testimony indicates that the move to California was a family affair, and that Respondent's "revelation" did not occur until she was in California – long after the decision to move had been made. *Id.* Validity of the 2009 Agreement aside, it cannot be the basis for consent to the particularized and deceitful events that transpired in this case. Thus, Respondent has not satisfied her burden, and consent is not a defense to the instant Petition.

### b. The Court will Not Consider the Views of the Child

Both Petitioner and Respondent discuss the consent and opinions of the Child in their submissions to the Court. *See* Pet. Brief p. 22; Resp. Brief p. 15 (arguing that the mature age exception promulgated in Article 13 of the Hague Convention applies).

Article 13 of the Hague Convention indicates that a court may "refuse to order the return of a wrongfully retained child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [her] views." *Tann*, 648 Fed.Appx. at 148 (quoting *Blondin v. Dubois*, 238 F.3d 153, 166 (2d Cir. 2001)). The Hague Convention does not establish an age a child must attain before being old and mature enough to give rise to this exception. *Id.* at 149.

Thus far, the Court has employed measures to protect and shield the Child from her parent's bicontinental quarrel, and the Court will continue to do so by refraining from requiring the Child to testify or choose between her parents. Even if the Court were inclined to analyze this exception, the Parties have provided the Court with no evidence indicating that the Child is of the age or level of maturity that would render it appropriate to take her views into consideration. *See* Resp. Brief p. 17.

## CONCLUSION

"The object of the Convention is to dissuade parents ... from engaging in gamesmanship with a child's upbringing in order to secure an advantage in an anticipated custody battle." *Gitter*, 396 F.3d at 134. In accordance with that mission, and for the aforementioned reasons, Petitioners Petition for Return of a Child is hereby **GRANTED**. Respondent is hereby **ORDERED** to return the Child to the custody of Petitioner for the purposes of repatriation to Israel.

**SO ORDERED.**

**Dated:** July 26, 2019
New York, New York

ANDREW L. CARTER, JR.
**United States District Judge**